[No. 42069.    En Banc.    May 25, 1972.]

RICHARD SCHURK et al., *Appellants,* v. RONALD CHRISTENSEN et al., *Respondents.*

*Stanley B. Allper,* for appellants.

*Merrick, Hofstedt, Schumm & Lindsey* and *James M. Lindsey,* for respondents.

HUNTER, J.—This is an action for damages resulting from the alleged sexual molestations of a 5-year-old girl, Maria Argo, by a 15-year-old boy, Reed Christensen.

The action was instituted by Dorothy Schurk, the mother, and Richard Schurk, the stepfather, of Maria Argo, as guardian ad litem for Maria, and in behalf of themselves to recover damages from Reed Christensen and the parents of Reed Christensen, for alleged damages sustained by Maria and to the Schurks resulting from the sexual molestations of Maria by Reed Christensen.

This appeal is from an order granting a summary judgment. All facts alleged are therefore deemed to be true at this stage of the proceeding.

The Schurks and Christensens were neighbors in Seattle. Mrs. Schurk had three children by a former marriage and needed assistance in their care while she was working as a waitress at the Black Angus Restaurant. On occasions, Mrs. Christensen babysat for Mrs. Schurk commencing in December, 1967. During the month of May, 1968, Mrs. Christensen told Mrs. Schurk that her son, Reed Christensen, was a good and capable babysitter and, as a result, he was hired by Mrs. Schurk to take care of her children as a babysitter, commencing at that time.

The record shows, however, that Mrs. Christensen knew her son had a lengthy history of having sexually molested young girls; that one of the children with whom he was known to have taken liberties was his own 6-year-old sister, Carla. This information was never disclosed to the Schurks.

The record shows that some time between May and September, 1968, Reed Christensen molested Maria Argo two to five times, taking liberties upon her person, attempting vaginal penetration, and forcing her into acts of sodomy. None of these occurrences were discovered by the Schurks

until late in September, 1968. Prior to that time there was nothing from Maria's appearance or conduct, observed by Mrs. Schurk, to indicate this was going on or that anything was wrong. The initial discovery was made when the 6-year-old Carla Christensen told Mrs. Schurk of these occurrences when she had been left in the care of Mrs. Schurk. Thereupon, Mrs. Schurk interrogated Maria, who then gave her version of what had happened.

Mrs. Schurk immediately became ill and suffered severe emotional distress which required treatment by a physician, hospitalization and psychiatric care. The effects of the molestations have also required medical and psychiatric care for Maria. Expert opinion indicates that future treatment for both is quite likely to be necessary.

This action for damages followed. The Schurks sought recovery against the Christensen parents and their son, Reed Christensen, for mental anguish and distress, and for their medical and psychiatric expenses incurred and to be incurred. Further, for recovery of loss of wages by reason of their care for Maria and their expenses incurred and to be incurred, present and future, in behalf of Maria, as a result of the sexual molestations. Also, claims as guardian ad litem in behalf of Maria Argo were sought against the Christensen parents and their son, Reed.

The defendants interposed a motion for summary judgment for dismissal of all claims of the plaintiffs Schurks individually. The motion was granted by the trial court, dismissing the Schurks' claims against the Christensen parents, and denying the motion for dismissal of their claims as against Reed Christensen. The claims of Maria Argo, through her guardian ad litem, against the Christensen parents and Reed, are not involved in this appeal.

The plaintiffs Schurks appeal from the judgment dismissing their claims against the defendant Christensen parents. The defendant, Reed Christensen, cross-appeals from the failure of the trial court to grant a dismissal of the plaintiffs' claims against him.

The Schurks' primary contention is that the trial

court erred in dismissing their claims relating to mental anguish and distress. By a long line of decisions in this state, we have, as a general rule, denied recovery for mental anguish and distress in cases not involving malice or wrongful intent, unless there has been an actual invasion of a plaintiff's person or security, or a direct possibility thereof.[1] We recently reiterated and adhered to this rule with a review of our cases and authorities in *Smith v. Rodene*, 69 Wn.2d 482, 418 P.2d 741 (1966), and also in the case of *Murphy v. Tacoma*, 60 Wn.2d 603, 374 P.2d 976 (1962). This is the general rule in the majority of jurisdictions in this country.

The recognized policy considerations, for the general rule limiting recovery for mental distress under the conditions previously enumerated, is premised upon the policy considerations aptly stated by the Supreme Court of Hawaii in *Rodrigues v. State*, 52 Hawaii 156, 472 P.2d 509, 519 (1970):

> Two primary considerations underlie the present limited scheme of protection: (1) the likelihood that courts will be flooded by fraudulent claims and (2) the defendant's potentially unlimited liability for every type of mental disturbance.

The courts, in cases departing from the general rule, having in mind these policy considerations, have done so with caution, on a case-by-case basis, circumscribed with guidelines and conditions.

The leading case upon which the plaintiffs rely is *Dillon v. Legg*, 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968). In that case the mother witnessed the injuries to her child, resulting in the child's death caused by the defendant's negligent operation of his motor vehicle. The mother was out of the field of danger and was not in apprehension of her own safety. No malice or wrongful intent was involved. Yet the court allowed the mother to recover for mental anguish and distress suffered from the

---

[1] It is admitted there was no malice or wrongful intent on the part of the Christensen parents in the present case. Neither does the record show any invasion of plaintiffs' persons or security.

shock of observing her daughter's serious injuries in the accident from which the daughter died. That court stated at page 740:

> We note, first, that we deal here with a case in which plaintiff suffered a shock which resulted in physical injury and we confine our ruling to that case. In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) *Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it.* (2) *Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.* (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.
>
> The evaluation of these factors will indicate the *degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case.

(Italics ours.)

In *Dillon* the mother *was* near the scene of the accident. She observed her daughter being injured and did not learn the facts from others.

In the instant case, the mother was not near the scene of the molestations; she did not observe these injuries occurring to her daughter, and learned of the occurrences at a

later date from a third person. We do not believe the facts of the instant case even come within the guidelines of *Dillon* to indicate a degree of foreseeability by the defendant parents, sufficient to predicate recovery by Maria Argo's mother for mental anguish and distress.

We have examined all of the cases cited by the plaintiffs, and find no case that has departed from the general rule, to the extent as would be required in this case to allow recovery for mental anguish and distress by the Schurks against the Christensen parents.

We do not hold that the strict application of the general rule against recovery for mental anguish and distress in tort liability cases should not be reexamined. We hold this is not the case for consideration of a change of this long established rule since it would be of no avail to the plaintiffs.

The Schurks further contend they are entitled to recover on the theory of breach of contract. This contention is without merit. The facts in this case do not disclose the existence of a contract between the Christensens and the Schurks for the care of their daughter by the defendant son, Reed Christensen.

The plaintiffs Schurks furthel contend the trial court erred in dismissing their claim for expenses incurred, and to be incurred, in behalf of Maria Argo, and for loss of wages resulting from their care for her. We agree. These claims do not come within the ambit of the restrictive rule in proof of damages for mental anguish and distress, and are compensable if established at the trial to be reasonably necessary and the proximate result of the parents' negligence.

The defendant's cross-appeal is without merit. The plaintiffs' claims against the defendant, Reed Christensen, are a result of willful and intentional sexual molestations of their daughter. *See Smith v. Rodene, supra; Murphy v. Tacoma, supra; Jensen v. Lawrence,* 94 Wash. 148, 162 P. 40 (1916); *Eckhart v. Peterson,* 94 Wash. 379, 162 P. 551 (1916); *Magnuson v. O'Dea,* 75 Wash. 574, 578, 135 P. 640 (1912); *Pickle*

*v. Page,* 252 N.Y. 474, 169 N.E. 650, 72 A.L.R. 842 (1930); Prosser, Torts, § 103 at 693-95 (2d ed. 1955).

The judgment of the trial court is affirmed, except that it is reversed as to the dismissal of the plaintiffs' claims against the Christensen parents for recovery of reasonable and necessary expenses incurred, and to be incurred, for the benefit of the minor child, and for loss of wages of the Schurks, all resulting from the sexual molestations by the defendant, Reed Christensen.

The case is remanded for further proceedings consistent with our holding in this opinion. Costs will abide the final determination of the cause.

HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur.

FINLEY, J. (dissenting)—I cannot agree with the majority's application of the rule of *Smith v. Rodene,* 69 Wn.2d 482, 418 P.2d 741 (1966), that there can be no recovery for mental and emotional distress in cases not involving malice or wrongful intent, unless there has been an actual invasion of a plaintiff's person or security, or a direct possibility thereof. I am convinced that the traditionally advanced justifications for retaining this limitation on recoveries for tortious conduct are no longer appropriate or justifiable, and that, contrary to the majority's assertion, the instant case *is* an appropriate one for altering an old and, I think, outmoded rule, legal hypothesis or principle. This court should therefore reverse the action of the trial court granting summary judgment and allow this case to proceed to trial on the issue of the liability of the parents of Reed Christensen for the emotional distress suffered by Mr. and Mrs. Schurk.

The argument for retention of the old rule is usually phrased in terms of public policy considerations. I believe that an analysis of the opinions denying recovery in such cases discloses that the alleged public policy is based on one or more of the following reasons: (1) there is no precedent for such recovery; (2) allowance of such recovery will increase litigation; (3) damages from emotional injuries

are difficult to prove and measure, and allowance of recovery for such injuries would therefore lead to fraudulent claims and actions; and (4) allowance of such recovery will lead to unlimited liability of defendants. *See* Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. 260, 273-74 (1921); *Rodrigues v. State,* 52 Hawaii 156, 472 P.2d 509, 519 (1970).

The first reason given for the existence of the alleged public policy is no reason at all. "If it were, every case of first instance would be decided against the party invoking the new rule of law or the new application of an old rule." Throckmorton, *Damages for Fright,* at 274. Furthermore, precedent does now exist for the allowance of recovery for emotional harm suffered by one who is not within the zone of danger of a tort. The California Supreme Court, in *Dillon v. Legg,* 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968), allowed recovery by a mother standing outside the zone of danger who witnessed the death of her child in an automobile accident. This rule has been extended in *Archibald v. Braverman,* 275 Cal. App. 2d 253, 79 Cal. Rptr. 723 (1969), to allow recovery by a mother who did not actually witness her child's accident but came upon the scene soon after the accident had occurred.                    ·

Other jurisdictions have begun to follow the lead of the California court in expanding the right of recovery for negligently inflicted emotional distress. The Supreme Court of Hawaii, in upholding a judgment for a homeowner who suffered serious mental distress from flood damage caused by a culvert which was negligently allowed to become blocked, held that there is a duty to refrain from negligent infliction of emotional distress. *Rodrigues v. State, supra.* And in *Wallace v. Coca-Cola Bottling Plants, Inc.,* 269 A.2d 117, 121 (Me. 1970), the Supreme Court of Maine adopted a similar rule in stating that:

> [W]e adopt the rule that in those cases where it is established by a fair preponderance of the evidence there is a proximate causal relationship between an act of negligence and reasonably foreseeable mental and emotional

suffering by a reasonably foreseeable plaintiff, such proven damages are compensable even though there is no discernable trauma from external causes. The mental and emotional suffering, to be compensable, must be substantial and manifested by objective symptomatology.

Furthermore, the English courts have long allowed recovery for negligently inflicted emotional distress. *Hambrook v. Stokes Bros.*, 1 K.B. 141 (1925). Most recently, the principle has been extended in England to allow recovery by the widow of a man who suffered severe psychoneurotic symptoms after serving, with no possibility of injury to himself, as a rescuer following a gruesome train wreck. *Chadwick v. British Rys. Bd.*, 1 W.L.R. 912 (1967). Commentators have argued for recognition of similar rights in the United States, with the liability of the defendant being limited only by the foreseeability of the harm caused:

> In other cases, however, plaintiff is outside the zone of physical risk (or there is no risk of physical impact at all), but bodily injury or sickness is brought on by emotional disturbance which in turn is caused by defendant's conduct. Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted. Plaintiff would then be within the zone of risk in very much the same way as are plaintiffs to whom danger is extended by acts of third persons, or forces of nature, or their own responses (where these things are foreseeable).

(Footnotes omitted.) 2 F. Harper and F. James, The Law of Torts 1035-36 (1956).

Nor can it be argued that there is no precedent for the recovery of emotional damages in other circumstances in the state of Washington. We have consistently held that damages for mental suffering are recoverable as incident to physical harm. *Green v. Floe*, 28 Wn.2d 620, 183 P.2d 771 (1947); *Cote v. Allen,* 50 Wn.2d 584, 313 P.2d 693 (1957). Furthermore, such damages are recoverable even without accompanying physical harm where there is a direct possibility of such harm to the plaintiff. *See Smith v. Rodene,* 69 Wn.2d 482, 418 P.2d 741 (1966); *Frazee v. Western Dairy*

*Prods.,* 182 Wash. 578, 47 P.2d 1037 (1935). And emotional distress, if inflicted intentionally, constitutes an independent tort. *Gadbury v. Bleitz,* 133 Wash. 134, 233 P. 299, 44 A.L.R. 425 (1925); *Browning v. Slenderella Systems,* 54 Wn.2d 440, 341 P.2d 859 (1959). This court has apparently not been deterred from allowing damages for emotional harm by the argument that such damages are too difficult to measure or assess.

The second reason assigned for a public policy not allowing recovery for emotional damages is that allowing such damages will increase litigation. The answer to this reasoning is simple; the courts exist to provide a means of obtaining redress for injuries, not to restrict litigation.

> [T]he frequency with which such suits are brought, after making liberal allowance for groundless claims, is the strongest evidence of the amount of injury inflicted and of the justice of the rule allowing a recovery.

Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. at 276.

Third, it is claimed that damages from nervous shock are difficult to prove and measure, and that allowance of recovery for such injuries would therefore lead to the bringing of actions involving fraudulent claims. This reasoning was valid in the eighteenth century; it is not valid today. Even at the beginning of this century Kennedy, J., in *Dulieu v. White & Sons,* 2 K.B. 669, 681 (1901), wrote that:

> My experience gives me no reason to suppose that a jury would really have more difficulty in weighing the medical evidence as to the effects of nervous shock through fright, than in weighing the like evidence as to the effects of nervous shock through a railway collision or a carriage accident, where, as often happens, no palpable injury, or very slight palpable injury, has been occasioned at the time.

Today we know that mental anguish and emotional distress are injuries as real and as physical in their causes and effects as those that might be produced by the common law tort of battery. Medical science has learned how to diagnose and, in large measure, how to cure, these injuries. Their existence or nonexistence is as susceptible of proof

(or disproof) as many physical injuries for which recovery is unquestionably allowed; for instance, a whiplash injury to the neck.

Furthermore, the distinction between physical and mental injury is at bottom an empty one. On one hand it can be said that all pain, whether from "physical" or "mental" injuries, is mental. "Psychological evidence and phenomenological theory suggests that all pain is mental in that it is consciously perceived—that if it is not perceived, there is no pain." Comment, *Mental Distress in Psychological Research*, 21 Baylor L. Rev. 520, 522-23 (1969). On the other hand, fear or emotional distress cannot exist without accompanying *physical* manifestations; all acute emotional experiences involve physical change. Specifically, emotionality involves changes in digestion, elimination, heartbeat, respiration, electrical potential of the skin, sugar level, and pilomotor responses. *Id*; *see* Selye, The Physiology and Pathology of Exposure to Stress 336-40 (1960). Given the present extent of medical knowledge, it must be conceded that:

> Fear is more than a purely emotional and subjective response. There are marked physical reactions which, in certain cases, have deep and significant effects upon the entire human organism. Mental distress induced by fear is, therefore, capable of clear and convincing proof.

(Footnotes omitted.) Comment, *Bystander Recovery for Mental Distress*, 37 Fordham L. Rev. 429, 448 (1969).

Of course it must be conceded that damages are not as precisely ascertainable in this case as they are, for example, under a carefully drafted liquidated damages clause of a contract. However, we have consistently held that recovery of substantial damages is not to be denied merely because the extent or amount thereof cannot be ascertained with mathematical precision, provided the evidence is sufficient to afford a reasonable basis for estimating loss. *E.g. Prier v. Refrigeration Eng'r Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968); *Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 774, 440 P.2d 448 (1968). Nor has the diffi-

culty of precisely ascertaining emotional damages kept this court from allowing recovery for such damages in the instances discussed above. The absurdity of flatly denying any recovery for emotional damages because of difficulty of proof is easily demonstrated by considering the case of a defendant who negligently frightens a plaintiff. Say that the fright causes the plaintiff to experience a nervous shock and also to fall, and that the fall results in bodily bruises. Clearly, under the doctrine of *Green v. Floe, supra,* and *Cote v. Allen, supra,* that damages for mental suffering are recoverable as incident to physical harm, the plaintiff could recover not only for the bruises but also for the nervous shock. Yet in this case the nervous shock for which recovery is allowed is no more susceptible of proof and no less remote from the fright which caused it than it would have been if unaccompanied by the fall and bruises.

It seems to me entirely too tenuous, perhaps even biased and irrational for serious judicial credence to be given to the argument that causes of action such as the one now before this court are particularly likely to lead to fraudulent claims. Certainly, such claims are no more likely to be false than claims for damages for intentionally inflicted emotional distress, already recognized as an independent tort in this state. *Gadbury v. Bleitz, supra.* In any case, we should reject the argument that we must deny recovery upon a legitimate claim because other fraudulent claims may be urged. *See* Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. at 276.

> [T]he fact that there may be greater opportunity for fraud or collusion in one class of cases than another does not warrant courts of law in closing the door to all cases of that class. Courts must depend upon the efficacy of the judicial processes to ferret out the meritorious from the fraudulent in particular cases.

*Borst v. Borst,* 41 Wn.2d 642, 653, 251 P.2d 149 (1952).

The fourth and last reason assigned for the alleged public policy against recovery in cases of this type is that the allowance of such recovery will lead to unlimited liability

on the part of defendants. To the extent that this is not merely a restatement of the preceding reason, it can be answered simply by saying that allowance of recovery in such cases will lead only to as much liability as the courts, *applying society's notions of just compensation,* allow it to lead to. We can enunciate these standards in the future, as appropriate cases come before us; I would not now decide whether in the absence or reduced weight of various of the factors present in this case, I would conclude that an emotional injury to someone who saw or learned about an accident was not reasonably foreseeable and that therefore defendant owed no duty of due care to the plaintiff. I do not pretend or imagine that these standards will be easy to set. But I do not believe that this court should let the fear of the inability to fix boundaries prevent it from giving appropriate relief in this case. This court should not deny justice to *parties* in the present in order to save *itself* from imagined legal difficulties in the future.

I believe, therefore, that the reasons which are given to support the alleged public policy against recovery in such cases are without merit. Accordingly, such a dubious public policy should not override the general principles of tort liability and prevent recovery in this case.

> As the commentators have suggested, the problem should be solved by the application of the principles of tort, not by the creation of exceptions to them. Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion.

*Dillon v. Legg,* 68 Cal. 2d 728, 747, 441 P.2d 912, 69 Cal. Rptr. 72 (1968); *see also* 2 F. Harper and F. James, The Law of Torts, *supra* at 1039, Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. at 277.

Not only do I believe that the alleged public policy prohibiting recovery in cases of this type is untenable and should be declared inapplicable, I am also convinced that this case presents unique circumstances which justify and

require the granting of relief even if the existing policy against such relief is retained.

The majority opinion quotes at length from *Dillon* and emphasizes certain factors which the California court listed as being relevant in determining whether defendant owed plaintiff a duty of due care—the proximity of the plaintiff to the scene of the accident, and the directness of the emotional impact which caused the shock. The majority opinion then points out that these factors or tests are less well satisfied in the instant case than they were in *Dillon*.

I do not deny that the factors enunciated by the California court are relevant in determining the foreseeability of harm, and hence, under the rule of *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969), the duty of care owed to a plaintiff, *in the case of an automobile accident where the defendant had no prior contact with the plaintiff*.

To begin with, however, we are not dealing with an automobile accident in this case. The case before us involves the rape of a 5-year-old girl. The terminology of the auto accident cases has no applicability here. It means nothing to consider whether the rape of the daughter actually invaded the security of the mother. It is meaningless to talk about the zone of danger of a rape; if the mother had been present or within the zone of danger, there would have been no rape.

Nor does the existence of duty of care in this case have to be predicated only upon the foreseeability of harm to the parents of the victim. The question to be asked is not whether in raping the daughter the defendant Reed Christensen could foresee that emotional harm would be suffered by her parents (though such injury is in my opinion clearly foreseeable), but whether in recommending their son as a babysitter while having knowledge of his sexual propensities, the Christensens breached a duty which they owed to Maria Argo's parents.

It is the rule in this state that if a plaintiff is to have his case submitted to the jury he must first produce substantial evidence to demonstrate that:

(1) there is a statutory or common-law rule that imposes a *duty* upon defendant to refrain from the complained-of conduct . . .; (2) the defendant's conduct violated the duty; and (3) there was a sufficiently close, actual causal connection between defendant's conduct and the actual damage suffered by plaintiff.

*Rikstad v. Holmberg,* 76 Wn.2d 265, 268, 456 P.2d 355 (1969). Foreseeability is not appropriately considered as part of the causation issue, though it is useful in determining the limits of the defendant's duty. *Id; Wells v. Vancouver,* 77 Wn.2d 800, 467 P.2d 292 (1970).

In the instant case, it cannot be disputed that the causal connection requirement is satisfied. To me it is equally clear that the defendants had a duty to refrain from recommending their son as a babysitter when they knew of his bizarre sexual proclivities, and that they violated that duty when they recommended him. This duty was owed to the Schurk parents, not to the daughter, since the parents were the ones who were negligently misled. In considering the liability of the defendant parents to the plaintiff parents, the tort that was committed was not the intentional rape of 5-year-old Maria Argo by Reed Christensen, but rather the negligent misrepresentation of Reed Christensen's abilities and reliability as a babysitter by his parents. This is not an emotional-injury-to-a-bystander case. The breached duty and the resultant liability flow directly from the defendant parents to the plaintiff parents. The principles of *Dillon* and *Smith v. Rodene,* 69 Wn.2d 482, 418 P.2d 741, (1966), do not apply to the instant case.

In this case, the contact of defendant parents was with the plaintiff parents. They recommended their son as a babysitter. They thereby breached their duty to use reasonable care. It may make sense to say, as the California Supreme Court did in *Dillon,* that distance of time and space limits a defendant's duty to a plaintiff as to whom he has directly breached no duty of care. But where a defendant has dealt directly with the plaintiffs and has breached a duty owed to them, such a rule has no place. It is as if the

father of the negligent defendant driver in *Dillon* had told a child's mother that she would be safe in letting her child play in a particular field where he knew that his son often drove his car, and then tried to disclaim liability for the mother's emotional injuries from the resulting death or injury of her daughter on the grounds that the mother was not within the zone of danger of his son's tort.

Though under the above analysis it is not necessary to do so, it is possible to view the representations of Mrs. Christensen as to her son's competence as a sort of contractual commitment. Under this interpretation, the "zone of danger" rule which has previously been used to determine foreseeability in automobile accident cases in this state (*Smith v. Rodene, supra*), is irrelevant, since the requisite breach of duty is provided, not by foreseeability of harm to the plaintiff parents, but by the assurances made to them that Reed Christensen was a competent and reliable babysitter. The law has long recognized the right of witnesses or discoverers of physical harm to recover for their emotional suffering when such suffering resulted from a contractual duty owed to them by the defendant. *See Gulf, C. & S. F. Ry. v. Coopwood*, 96 S.W. 102 (Tex. Civ. App. 1906); *Holland v. St. Paul Mercury Ins. Co.*, 135 So. 2d 145 (La. App. 1961).

The majority opinion takes final refuge in the assertion that "this is not the case for consideration of a change of this long established rule . . ." I disagree. This is a very appropriate case for reexamination of the general rule against recovery for negligently caused mental anguish and emotional distress unaccompanied by physical impact or the possibility thereof. The negligent misrepresentation of their son's babysitting capabilities constitutes a breach of duty running directly from the defendant parents to the plaintiff parents, a breach which involves clearly foreseeable and causally related harm to the plaintiff parents. As discussed above, we can find the existence of a breached duty without over-ruling the "zone of danger," "invasion of plaintiff's security" rules as they are applied to auto acci-

dent cases. Though I personally doubt that it would do so, closer examination could reveal that those rules adequately serve to define the limits of foreseeability of harm, and hence the duty of care, in such cases.

The case now before us presents a clear case of breached duty and causally related physically manifested emotional harm. I would not let a misapplication of precedent, a misplaced sympathy for beleaguered defendants, or an eighteenth century view of the proficiency of medical and psychiatric evidence, prevent this court from allowing the claims of the Schurk parents to proceed to trial on the merits.

I would reverse and remand for trial.

HAMILTON, C.J., and ROSELLINI, J., concur.

Petition for rehearing denied July 11, 1972.